**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

Jeffrey Hagan, O.D., et. al.,

       Plaintiffs,                            No. 05-72517

v.                                      Hon. Nancy G. Edmunds

Vision Service Plan,

       Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING THE PLAINTIFFS' REVISED**
**MOTION FOR A PRELIMINARY INJUNCTION**

**FINDINGS OF FACT**

**A.     Background**

1.      The three practitioner Plaintiffs, Drs. Hagan, Foon and Liberman, currently are VSP member doctors, and they have been VSP member doctors for a combined 55 years, since 1988, 1986 and 1986, respectively.  (Complaint, ¶¶22, 175, 191; VSP website print-outs, Joint Exhibit 27).

2.      The Plaintiffs have operated franchises of D.O.C. Optics Corporation ("DOC") during the entire period that they have been VSP member doctors.  (Complaint, ¶¶22, 174, 190).

3.      VSP is now attempting to terminate Drs. Hagan, Foon and Liberman as member doctors based on the Plaintiffs' franchise affiliation with DOC.  (Transcript of 4/11/05 Deposition of D. Humphreys ("Humphreys"), 201-202, Joint Exhibit 69; 5/20/04 and 12/10/04 letters, Joint Exhibit 46).

**B.     The Grandfather Agreements**

4.      On June 23-24, 1995 VSP's Board of Directors unanimously voted to extend "grandfather" agreements to the practitioner Plaintiffs and hundreds of

other member doctors who were affiliated with a franchise, whereby VSP agreed to allow the doctors to retain their panel membership despite the fact that, in VSP's opinion, the doctors did not have ownership and complete control of their practices.   (Board Meeting Minutes, 8/15/95 e-mail, 9/20/95 memorandum, 10/20/95 letter, 10/26/95 letters, 11/7/95 memorandum, 10/1/97 memorandum, Joint Exhibit 9; Transcript of 1/21/05 Deposition of Jeffrey Vellenga – hereafter "JV1" - at 36, 105-106, 151, Joint Exhibit 76; Answer to Complaint, ¶82).

5.     As part of its grandfathering effort, VSP contacted DOC in 1995 and requested that DOC provide to VSP a list of DOC affiliated doctors, including doctors who were employed at DOC corporate locations, as well as doctors who owned and operated franchised locations of DOC. (2/8/05 Deposition of J.Wilson ("Wilson"), 46-48, Joint Exhibit 79; Answer to Complaint, ¶79; Transcript of 4/7/05 Deposition of James Lies ("Lies"), 43, Joint Exhibit 72).

6.     DOC is an established optical chain, having been founded in Michigan in 1946.  (Lies, 8, Joint Exhibit 72).

7.     VSP's purpose and intent in contacting DOC in 1995 was to grant grandfather status to all of the doctors who were then affiliated with DOC, including corporate doctors and franchised doctors.  (Wilson, 46-48, Joint Exhibit 79; Lies, 43, Joint Exhibit 72).

8.     In response to VSP's request, DOC provided to VSP in 1995 a list of DOC affiliated doctors, which included the names of the practitioner Plaintiffs, Jeffrey Hagan, O.D., Kenneth Foon, O.D. and Michael Liberman, O.D. (Transcript of 4/7/05 Deposition of Charles Males ("Males"), 12-13, 15, Joint Exhibit 73; Transcript of 4/7/05 Deposition of James Lies ("Lies"), 57-58, Joint Exhibit 72; Answer to Complaint, ¶80).

9.     In addition to DOC, other franchisors provided affiliated doctor lists to VSP in 1995 as well.  (Wilson, 48, Joint Exhibit 79).

10.     VSP then extended such grandfather or "restricted membership" agreements to all doctors on its panel who were affiliated with a franchise, totaling 271 in Michigan alone. (10/26/95 letters and 11/7/95 memorandum, Joint Exhibit 9; JV1, 91-92, 96, Joint Exhibit 76; 2/8/05 Deposition of Jeffrey Vellenga – hereafter "JV2", 271, Joint Exhibit 77; Supplemental Answer to Interrogatory 9, Joint Exhibit 21; 8/1/03 Memorandum of J.Vellenga, Joint Exhibit 42; Lies, 42-43, Joint Exhibit 72).

11.     VSP's Counsel admitted on the record during the October 17, 2005 hearing on the instant Motion that Drs. Hagan, Foon and Liberman were on the grandfather list in 1995.

12.     In accepting the terms of the grandfather arrangements, the franchisors elected to forebear from pursuing litigation against VSP to enforce the rights of affiliated doctors who might otherwise have been dropped from VSP's panel.  (Raven Affidavit, ¶11, Joint Exhibit 8).

13.     VSP regularly referred to its grant of grandfather status as "the grandfather agreements".  (10/20/97 Memorandum and 10/20/97 Letter, Joint Exhibit 9; Raven Affidavit, ¶14, Joint Exhibit 8).

14.     VSP sent letters dated October 26, 1995 to some franchised doctors detailing the terms of the grandfathering, including a letter addressed to Dr. Liberman.  (10/26/95 letters, Joint Exhibit 9; JV1, 105, 110-111, Joint Exhibit 76; Answer to Complaint, ¶83; Raven Affidavit, ¶13, Joint Exhibit 8).

15.     The grandfather letters, which are identical to one another in all material respects, provide that the doctor "will be permitted to retain your VSP

3

panel membership, so long as you remain employed by your present employer, practice at your present location and meet all other VSP rules and regulations." (10/26/95 letters, Joint Exhibit 9).

16.     VSP produced an unsigned copy of a letter dated October 26, 1995 that was addressed to Dr. Liberman, which is a part of VSP's member doctor file that it maintains regarding Dr. Liberman.  (10/26/95 letter, Joint Exhibit 9).

17.     VSP identified the unsigned copies of the October 26, 1995 letters as being the letters that were sent to the Plaintiffs which gave the Plaintiffs the same rights and privileges as other grandfathered doctors.  (JV2, 303-304, Joint Exhibit 77).

18.     According to Jeff Vellenga, a VSP employee with direct responsibility for and firsthand knowledge of such matters, it was not necessary that each such franchised doctor receive a grandfather letter in order to be placed on grandfathered status; all VSP member doctors in 1995 who were affiliated with a franchise, chain or other retail-type entity were entitled to be placed on grandfather status.  (JV2, 235-236, 272; Joint Exhibit 77).

19.     VSP admits that Dr. Foon was entitled to be placed on grandfather status whether he received a grandfather letter or not.  (JV2, 235-236, Joint Exhibit 77).

20.     VSP has represented that membership was "grandfathered" for all franchise-affiliated doctors in Michigan who were member doctors as of June 25, 1995. (11/22/95 letter from L. Hampton, Joint Exhibit 11; Transcript of 1/21/05 Deposition of Linda Hampton, at 29, Joint Exhibit 68).

21.     Drs. Hagan, Foon and Liberman were VSP member doctors as of June 25, 1995.  (Complaint, ¶¶175, 191).

4

22.    VSP admits that member doctors whom it placed on grandfather status were excused from having to comply with VSP's "ownership and control" requirements (currently set forth in Condition E of the MDA), so long as they remained employed by their present employer, continued to practice at their present location, and met all other VSP rules and regulations.  (Answer to Complaint, ¶111; JV1, 108, 118, Joint Exhibit 76; Wilson, 57, Joint Exhibit 79).

23.    VSP's grant of grandfather status to the Plaintiffs was not time limited; the letters detailing the terms of the grandfather agreements do not state that the agreement would expire on any particular date.  (10/26/95 letters, Exhibit 23; Wilson, 57, Joint Exhibit 79; Raven Affidavit ¶12, Joint Exhibit 8; Lies, 43-44, Joint Exhibit 72).

24.    VSP admits that each of the grandfather agreements was and is perpetual, and was intended to apply to each successive MDA and each successive re-credentialing.  (10/1/97 Memorandum, Joint Exhibit 9; Wilson, 57-59, Joint Exhibit 79).

25.    VSP intended that its grant of grandfather status to those doctors would extend as long as the doctors remained with their current employer and met all other VSP membership rules.  (Wilson, 57-59, Joint Exhibit 79).

26.    On October 29, 2004 VSP asserted that all franchise doctors on its panel had been placed on a "limited" or "restricted" form of membership. (Supplemental Response to Interrogatory No. 9, Joint Exhibit 21; See also Answer and Supplemental Answer to RPOD 24, Joint Exhibit 22; 11/17/04 Renaud letter, Joint Exhibit 15).

27.    VSP explained under oath on October 29, 2004:

> All franchised doctors on VSP's panel are under a limited or restricted form of membership.  This means that they are not allowed to add anymore VSP doctors to their practices, they may not move the practice, they may not sell the practice.  These limitations are designed to ensure that, while the current VSP member doctor may retain membership, no additional doctors may join VSP as employees or owners of that practice and, when the member doctor retires or ceases to practice, the practice may not be sold to another VSP member doctor.

(Supplemental Response to Interrogatory No. 9, Joint Exhibit 21).

28.    Drs. Hagan, Foon and Liberman were VSP member doctors on October 29, 2004.  (Complaint, ¶¶22, 96, 175, 191; VSP website print-outs, Joint Exhibit 27).

29.    VSP's Jeff Vellenga, one of the individuals who was directly responsible for compiling the list of VSP's "grandfathered" doctors, testified that he had not heard such doctors referred to as being on a "restricted membership". (JV1, 83; Joint Exhibit 76).

30.    In the *Brighton Optical* litigation, VSP produced four different lists, each generated during 2005, identifying approximately 265 member doctors who are affiliated with a franchise or chain.  (Supplemental Response to Interrogatory 9, Joint Exhibit 21*;* Exhibit 5 to 1/21/05 Vellenga Deposition, Joint Exhibit 10; Supplemental Response to RPOD 61, Joint Exhibit 22; 7/20/05 Supplemental Production of Documents, Joint Exhibit 25).

31.    Although VSP has no documents that indicate that the Plaintiffs' grandfather status was ever revoked, the Plaintiffs' names do not appear on the 2005 grandfather lists. (See e.g., JV1, 135-136, 140, 162; JV2, 223, 227-229, 236, 247-248, 274-276, Joint Exhibit 77).

6

32.     VSP claims that it lost certain information that was maintained on its computer system that identified grandfathered doctors.  (Answer to *Brighton Optical* Complaint, ¶212; JV1, 135-136, Joint Exhibit 76).

33.     VSP admits that there may be inaccuracies in the grandfather list, and that certain doctors could inadvertently have been omitted.  (JVI, 91, 135-136, Joint Exhibit 76).

34.     VSP continues to list as grandfathered 32 other DOC affiliated doctors and locations.  (Joint Exhibit 25).

35.     The hundreds of member doctors on VSP's restricted membership list have not been the subject of any efforts by VSP to terminate their membership; VSP instead made a "business decision" to retain each of those franchised doctors.  (7/27/04 Deposition of C. Johnson, at pp. 62-67, Joint Exhibit 71; Wilson, 49-50, Joint Exhibit 79).

**C.     VSP's Knowledge Of The Plaintiffs' Franchise Affiliations And Review And Approval Of Their Franchise Agreements**

36.     VSP admits that it knowingly maintained the Plaintiffs and other VSP member doctors on its panel for many years despite being aware of the doctors' respective franchise affiliations.  (See e.g., JV2, 227-240, 274-275, 306-308, 317-318, 321-322, Joint Exhibit 77; Wilson, 60-62, Joint Exhibit 79)

37.     On July 24, 1996 Drs. Foon and Liberman submitted their DOC franchise agreement to VSP for review.  (7/24/96 letter, Joint Exhibit 17).

38.     On August 28, 1996 VSP's Jeffrey Vellenga sent a fax to Dr. Foon that stated the following:

> To complete the review of your franchise situation, VSP needs a letter which states the following addressed to both Dr. Kenneth Foon and Dr. Michael Liberman from D.O.C.  in the past, this letter has come from Randal Golden:

"You have asked that we approve as authorized suppliers (as defined under your D.O.C. Franchise Agreement) those eyeglass frame vendors and laboratory service providers which have been approved by Vision Service Plan ("VSP").  This letter will confirm that, based on D.O.C.'s investigation of VSP and its authorized eyeglass frame vendors and laboratory service providers, such vendors and labs are hereby designated as authorized Suppliers for you and as a D.O.C. franchisee."

(8/28/96 correspondence, Joint Exhibit 17).

39.     The next day, on August 29, 1996, DOC's Executive Vice President, Randal E. Golden, addressed a letter to Drs. Foon and Liberman containing the identical language requested by VSP.  (8/29/96 letter, Joint Exhibit 17).

40.     The material terms of the DOC franchise agreement reviewed by VSP in August 1996 are virtually identical to those contained in the current version of the DOC franchise agreement of which VSP now complains.  (DOC Franchise Agreements, Joint Exhibits 28 and 29).

41.     VSP concluded in 1995, 1996 and 1997 that franchise affiliations, including the Plaintiffs' affiliations with DOC, did not violate its membership rules. (JV2, 237-239, 274-275, 306-308, 317-318, 321-322, Joint Exhibit 77; Wilson, 60-62, Joint Exhibit 79).

42.     Since that time, there has been no change in VSP's membership rules or in the franchise relationships between the Plaintiffs and DOC.  (MDA, Joint Exhibit 1; DOC franchise agreements, Joint Exhibits 28 and 29).

43.     Despite its longstanding awareness of the franchise affiliations of the Plaintiffs and other VSP member doctors, as well as VSP's awareness of the terms of their franchise agreements, VSP did not attempt to terminate Drs. Foon and Liberman until December 12, 2004, and Drs. Foon and Liberman remain

8

VSP member doctors today.   (Termination Letters, Joint Exhibit 46, *Brighton Optical* Complaint, ¶¶125, 219, 232, 271, 296).[1]

**D.    VSP's Purported Revocation Of Some Grandfather Agreements**

44.    Notwithstanding the Plaintiffs' overwhelming evidence regarding the grandfather agreements, including VSP's own admissions, in its opposition to the instant Motion, VSP offers several contradictory theories, none of which are supported by the record.  (VSP's Opposition to Motion, pp. 5-7, ¶¶16-26)

45.    On one hand, VSP characterizes the grandfather agreements and the grandfather list as merely "purported" and "alleged" and implies that the term "grandfather agreement" was coined by the Plaintiffs.   (VSP's Opposition to Motion, p. 5, ¶¶16-17, 20).

46.    VSP then goes on to describe these very agreements in detail, however, referring to the agreements instead as a "restricted form of membership", notwithstanding that the only deposition testimony cited by VSP in support of its position, that of VSP's Janice Wilson, specifically includes Ms. Wilson's statement regarding doctors in Michigan and Ohio who were "grandfathered", while the cited testimony contains no reference to a "restricted form of membership".  (Wilson, 49, Joint Exhibit 79; VSP's Opposition to Motion, pp. 5-6, ¶¶18-19, 21).

47.    VSP subsequently contends that under procedures existing at the time, "VSP allowed doctors who obtained letters from their franchisors warranting that the franchisor would not exert control over the doctors' choice of suppliers would be freed from the membership restrictions and removed from the grandfather list."  (VSP's Opposition to Motion, p. 7, ¶25).

---

[1] VSP's formal termination hearings for Drs. Foon, Liberman, Curtin, Eaves and Schneider took place on October 26, 2005.

48.     Remarkably, VSP claims that the doctors who obtained such letters from their franchisors "were, thereafter, considered to have unrestricted VSP member doctor status and required to comply with all provisions of the MDA. That is why plaintiff doctors are not on the grandfather list." (VSP's Opposition to Motion, p. 7, ¶25).

49.     VSP later speculated, but provides no proof, that many doctors, including the Plaintiffs, "found that the membership restrictions caused them difficulties and wanted to be free of them." (VSP's Opposition to Motion, p. 7, ¶24).

50.     With respect to Dr. Foon, Dr. Liberman and certain other member doctors, VSP asserts that in 1996, while being fully aware of the doctors' franchise affiliations and franchise agreements, VSP granted full membership status to those doctors, and they were deemed to be in full compliance with VSP's ownership and control requirements. (JV2, 237-239, 306-308, 317, 321-322, Joint Exhibit 77; Wilson Deposition, 60-62, Joint Exhibit 79; Opposition to Motion, p. 7, ¶25).

51.     VSP admits that it thus concluded in 1996 that such franchise affiliations, including the Plaintiffs' affiliation with DOC, did not violate its membership rules. (JV2, 237-239, 306-308, 317, 321-322, Joint Exhibit 77; Wilson Deposition, 60-62, Joint Exhibit 79; Opposition to Motion, p. 7, ¶25).

52.     The only purported "evidence" that VSP has regarding the alleged revocation of the grandfather status of Drs. Foon and Liberman are the July 24, 1996 letter from Dr. Foon, the August 28, 1996 fax from Jeffrey Vellenga, and the August 29, 1996 letter from DOC. (Opposition to Motion, p. 7, ¶25, citing JV2, 306, Joint Exhibit 77).

53.     The matter of Drs. Foon and Liberman's grandfather status is not reflected anywhere in the July 24, 1996 letter from Dr. Foon, the August 28, 1996 fax from Jeffrey Vellenga or the August 29, 1996 letter from DOC.   Joint Exhibit 17).

54.     To the contrary, Mr. Vellenga's August 28, 1996 fax states only that the letter from DOC was required "[t]o complete the review of your franchise situation."  (8/28/96 correspondence, Joint Exhibit 17).

55.     The letter requested by VSP and obtained from DOC does not address in any manner DOC's purported control over Drs. Foon and Liberman's practice.   (Joint Exhibit 17).

56.     To the contrary, the August 29, 1996 DOC letter appears to solely benefit VSP, authorizing the doctors to use VSP's approved eyeglass frame vendors and laboratory service providers.  (8/29/96 letter, Joint Exhibit 17).

57.     There is no evidence that Dr. Hagan requested to be removed from grandfather status.  (Opposition to Motion, p. 7, ¶25).

58.     The documentation submitted by VSP in support of its claim regarding Dr. Hagan's purported revocation of his grandfather status, three Select Network application forms filled out by Dr. Hagan in 1995, 1996 and 1998, in no way support that claim.  (Joint Exhibit 19).

59.     The Select Network forms make no reference to Dr. Hagan's grandfather status.  (Joint Exhibit 19).

60.     The forms, which were sent to Dr. Hagan by VSP, state that "[a]s a VSP doctor, your practice has the opportunity to participate in optional plans referred to as the Select Network . . . Your practice participation in the Select Network is optional."  (Joint Exhibit 19).

61.     The forms do not indicate whether Dr. Hagan's Select Network applications were approved.  (Joint Exhibit 19).

62.     Mr. Vellenga is not aware of any record at VSP as to when or why a doctor was removed from the grandfather list.  (JV2, 203-204, Joint Exhibit 77).

63.     VSP's claim that the Plaintiffs and other grandfathered member doctors agreed to waive their protection under the grandfather agreement is not supported by any evidence.  (Opposition to Motion, *supra*).

64.     Indeed, VSP can identify only speculative, circumstantial evidence in support of its position, suggesting without explanation that "the only reasonable inference to be drawn" from the fact that the Plaintiffs are no longer on the list of grandfathered doctors is that the doctors "were removed from the list due to circumstances that occurred during the intervening years."  (VSP's Opposition to Motion, p. 6, ¶23).

65.     VSP's claim is even more dubious in light of the overwhelming evidence, including VSP's own admissions, as to the existence of the grandfather agreements with the Plaintiffs in 1995.  (See e.g., Joint Exhibits 9, 14, 72, 73, 76, 77, 79).

66.     Citing the October 26, 1995 letter, VSP argues that the restricted membership agreements, if they existed, must be interpreted as granting only a temporary waiver of the Plaintiffs' compliance with VSP's membership requirements.   (VSP's Opposition to Motion, p. 6, ¶21).

67.     VSP's argument here too must fail, as such a position not only is directly contrary to VSP's own admissions and internal memoranda confirming that the grandfather agreements were perpetual, the grandfather letters themselves provide that the doctor "will be permitted to retain your VSP panel

12

membership, so long as you remain employed by your present employer, practice at your present location and meet all other VSP rules and regulations." (Joint Exhibit 9; JV1, 105-107, Joint Exhibit 76; Wilson, 57-59, Joint Exhibit 79).

68.    VSP's argument that Section B.18 of the MDA constitutes an "integration clause" that invalidates any pre-existing grandfather agreements is similarly without merit.  (VSP's Opposition to Motion, p. 6, ¶21).

69.    There is no evidence that Section B.18 of the MDA either constitutes or was intended to constitute an integration clause with respect to the 1995 grandfather agreements, as that provision does not state that there are no other agreements or understandings between the parties.  (Joint Exhibit 1).

70.    In addition, Section B.18 of the MDA refers only to the verbal waiver of its terms; the grandfather agreement is a written instrument that has been ratified and confirmed by VSP in many different ways.  (See e.g., Joint Exhibits 1, 9, Wilson, 57-59, Joint Exhibit 79).

71.    VSP also contends without any supporting documentation that in 1995 the Plaintiffs were members of a panel of a company "known as Vision Service Plan of the Northeast."  (VSP's Opposition to Motion, p. 5, ¶¶17-18).

72.    However, there is no evidence that "Vision Service Plan of the Northeast", if it ever existed, was an independent company separate and distinct from VSP, and the deposition testimony cited by VSP in support of that contention specifically includes Ms. Wilson's acknowledgement that "[w]e were VSP prior to the merger and remained VSP.  So in that sense – we dropped the Northeast designation."  (Wilson, 13, Joint Exhibit 79).

73.     Ohio Secretary of State records reveal that "Vision Service Plan" was registered to do business in Columbus, Ohio even as early as 1991.  See .e.g., http://serform.sos.state.oh.us/Cgi-Bin/Rwcgi60.Exe?Imgc+Din=H143_0289.

74.     The member doctor applications used by VSP for doctors in Michigan have always identified the insurer as "Vision Service Plan", even prior to 1995.  (Joint Exhibit 2).

**E.     Terminations**

75.     In 2004 VSP suddenly issued notices of termination concerning the Plaintiffs' memberships.  (5/20/04 and 12/19/04 letters, Joint Exhibit 46).

76.     The sole basis for the terminations is that the Plaintiffs allegedly do not have complete control over their practices and dispensaries due to their franchise affiliations with DOC, which VSP claims is contrary to Condition E of the MDA.  (Humphreys, 201-202, Joint Exhibit 69).

77.     Although VSP stated in its termination letters for Drs. Foon and Liberman that it was terminating their memberships pursuant to the 90-day notice provision of the MDA, it subsequently conceded that the real reason for the termination was its belief that the doctors were in violation of Condition E.  *Id.*

78.     Condition E of the MDA states that the member doctor must have "majority ownership and complete control of all aspects of his/her practice, including dispensary".  (Joint Exhibit 1).

79.     VSP admits that had its Legal Department not determined that Drs. Foon and Liberman were in violation of Condition E, it would not have terminated them. (Humphreys, 201, Joint Exhibit 69).

80.     VSP's Optometry Director, Denis Humphreys, O.D., acknowledged that it is VSP's Legal Department alone that determines that the member doctor

lacks complete control over his practice and dispensary.   (Humphreys, 70-71, 110-111, 135-136, 152, 180-181, 190-192, 200-202, Joint Exhibit 69).

81.   Although the Plaintiffs' initial termination letters bore his stamped signature, Dr. Humphreys admits that he had no involvement in the letters, which were issued following the review of the Plaintiffs' franchise agreements by VSP's Legal Department.  (*Id.;* See also pp. 108, 144-145, Joint Exhibit 69).

82.   VSP's Susan Egbert has similarly testified that it is VSP's Legal Staff alone that determines whether a doctor's franchise agreement violates Condition E of the Member Doctor Agreement.  (Excerpt of 7/26/04 Deposition of Susan Egbert in *David Hardy v. Vision Service Plan,* Montana 1st Judicial District, Lewis & Clark Co., No. 2003-285, 55, Joint Exhibit 67).

83.   Although the sole basis for VSP's terminations of Drs. Foon and Liberman was a purported violation of Condition E, VSP failed to disclose this basis to the doctors in its initial termination letters or during the termination proceedings. (Humphreys, 200-201, Joint Exhibit 69; Joint Exhibit 46).

84.   VSP did not indicate why it is treating the Plaintiffs differently from the 32 other member doctors affiliated with DOC whom VSP is maintaining on its panel.  (Joint Exhibits 10, 46).

85.   VSP did not indicate in the termination letters or in any other communication why it is treating the Plaintiffs differently from the hundreds of other grandfathered doctors who are affiliated with a franchise whom VSP is maintaining on its panel.  (Joint Exhibits 10, 46).

## CONCLUSIONS OF LAW

1.   The purpose of preliminary injunctive relief is to protect and preserve the Court's ability to grant effective, meaningful relief after a

determination of the merits of the case.  See e.g., *Cords Corp. v. MedTronic, Inc.,* 835 F.2d 859 (Fed.Cir. 1987).

2.      It has frequently been noted that preliminary injunctive relief should be granted to prevent further and continuing injury and to protect the rights of the parties by preserving the status quo pending the final outcome of a lawsuit. *Cords Corp., supra.*

3.      When determining whether to issue a preliminary injunction, a district court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.  *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 458 (6th Cir. 1997).

For the reasons set forth in their Complaint and in the arguments below, the facts of this matter warrant the issuance of a preliminary injunction.

**A.      The Plaintiffs have a strong likelihood of success on the merits of their claims**

4.      The Plaintiffs have a strong likelihood of success concerning their two claims for breach of contract, breach of good faith and fair dealing, tortuous interference with business relations, and declaratory judgment.

Among the many reasons set forth, *infra*, the following issues provide compelling support for the Plaintiffs' position:

**i.      VSP Violated The Grandfather Agreements**

5.     The Plaintiffs' terminations violate the terms of the grandfather and/or restricted membership agreements, which protect the Plaintiffs from termination on this basis.

6.     By placing each of the practitioner Plaintiffs on grandfather status in 1995, VSP committed to the Plaintiffs and to DOC that it would never terminate the Plaintiffs based solely on their affiliation with DOC.

7.     At no time did VSP ever notify any of the Plaintiffs that their grandfather status had been revoked; to the contrary, VSP has completely ignored the fact of the Plaintiffs' grandfather status during the course of their terminations in the apparent hope that the issue will simply go away.

**ii.     The Plaintiffs Were Not Terminated in Good Faith**

8.     VSP has been aware of the Plaintiffs' franchise affiliations throughout the course of their memberships.

9.     VSP entered into "grandfather" or "restricted membership" agreements whereby it agreed that the Plaintiffs and dozens of other DOC affiliated member doctors would be allowed to retain their memberships indefinitely notwithstanding their franchise affiliations.

10.     VSP reviewed and approved the Plaintiffs' DOC franchise agreements in 1996.

11.     VSP repeatedly re-credentialed the Plaintiffs every two to three years.  (Complaint, ¶57).

12.     Then, without any evidence that the grandfather agreements were no longer valid, and despite the absence of any change in circumstances or evidence that DOC has exercised actual control over the Plaintiffs' practices, and despite continuing to agree to maintain 32 other DOC affiliated doctors on its

17

2:05-cv-72517-NGE-PJK   Doc # 43   Filed 12/15/05   Pg 18 of 21   Pg ID 805

panel, VSP suddenly claimed that the Plaintiffs were in violation of its membership rules by virtue of their affiliation with DOC.

13.     Pretending that it had only recently learned of those franchise affiliations, VSP proceeded to terminate the Plaintiffs without any mention whatsoever of the grandfather agreements, without identifying a single aspect of the franchise affiliation that supposedly was problematic, without identifying or presenting a single witness to testify as to the reasons for the termination, and ignoring the express terms of its own Hearings Procedure.  (Termination Letters, Joint Exhibit 46; Hearing Procedure, Joint Exhibit 52; JV2, 245-248, Joint Exhibit 77).

14.     That VSP has threatened the Plaintiffs' economic livelihood based on what may well have been a "clerical error" in omitting them from the grandfather list is appalling; that VSP never bothered to follow up on this error in the case of a similarly situated franchisee member doctor after learning of the situation is telling.

**B.      The Plaintiffs Will Be Irreparably Harmed**

15.     Termination of the Plaintiffs' VSP memberships would cause substantial and irreparable harm to their practices, damage that would not be fully compensable by money damages.

16.     An injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate.  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992). (Citation omitted).

17.     The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. *Basicomputer,* 973 F.2d at 512.

18.     Irreparable harm may be shown through the loss of customers, goodwill or business. See e.g., *Michigan Bell Telephone Co v. Engler,* 257 F3d 587, 599 (6th Cir. 2001); *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1181 (D.Kan.1988).

19.     In *Galper v. U.S. Shoe Corp.,* 815 F.Supp. 1037, 1044 (E.D.Mich.1993)*,* this Court rejected the defendants' claim that an optometrist who subleased space from a manufacturer and seller of prescription eyeglasses could quantify the amount of money that she would lose if she were to be evicted after six years.  815 F.Supp. at 1044.

20.     The *Galper* court agreed with the optometrist's position that an eviction was "substantially likely to injure her reputation as a professional and drive away customers and that such losses are impossible to quantify in money damages", and it concluded that if the plaintiff were evicted, she "likely would suffer irreparable harm in the form of damage to her reputation as a professional."  815 F.Supp. at 1044.

21.     The *Galper* court also found that public policy supported the optometrist's position that an eviction would disrupt the services that she provides to her patients, stating that "an eviction would likely disrupt plaintiff's optometry practice and her service to local residents.  Therefore, public policy favors the issuance of an injunction."  815 F.Supp. at 1044.

22.     In this case, as in *Galper,* termination would significantly disrupt the continuity of care provided to the many VSP insureds who are patients of the Plaintiffs, and it would lead to the termination of the great majority of those doctor-patient relationships.  (6/14/05 Foon Affidavit, 6/14/05 Hagan Affidavit and 2/23/05 Wirth Affidavit, Joint Exhibit 61).

23.     Numerous former patients who left ex-VSP member doctors after their terminations have found that it simply is not worth the extra expense and inconvenience that would be created by continuing to see the doctor on an out-of-network basis.  (Exhibit A to 2/23/05 Wirth Affidavit, Joint Exhibit 61).

24.     Although the potential damage to the Plaintiffs' businesses is tremendous from a financial standpoint, the damage will not be fully compensable by money damages, and the full extent of such damage would be difficult to calculate with specificity.

25.     It is well established that, in the context of a motion for a preliminary injunction, the damage to one's professional reputation that may occur if the injunction is not granted may constitute irreparable harm.  See e.g., *Galper v. U.S. Shoe Corp.,* 815 F.Supp. 1037, 1044 (E.D.Mich.1993) (finding that optometrist likely would suffer irreparable damage to her professional reputation if she were to be evicted); *Mercy Health Services v. 1199 Health and Human Service Employees Union,* 888 F.Supp. 828 (W.D.Mich.1995).

26.     In this case, as in *Galper,* termination of the Plaintiffs' memberships would also damage their professional reputations with current and prospective patients.

27.     The Plaintiffs have provided credible and compelling evidence of the substantial and irreparable harm that their practices will suffer if the termination of their VSP memberships is allowed to take effect.  (Affidavits, Joint Exhibit 61).

## C.     The Balance Of Harms Overwhelmingly Favors An Injunction

28.     VSP will not suffer any material harm if the Plaintiffs are allowed to remain on its panel.

29.     Far from being an imposition, VSP has already afforded this relief to thousands of similarly situated doctors on its panel, including 32 DOC affiliated doctors, and VSP has allowed the Plaintiffs to be on its panel for a combined 55 years.

30.     The relative harm to the Plaintiffs and to the public of allowing the terminations to take effect substantially outweighs the negligible harm that VSP would suffer, if any, from allowing the Plaintiffs to remain members of VSP.

## CONCLUSION

The Court hereby GRANTS Plaintiffs' motion for a preliminary injunction, and ORDERS that Defendant be enjoined and restrained from terminating the memberships of Drs. Hagan, Foon and Liberman.  The Court shall consider at a later date whether to award sanctions against Defendant for its many misleading and disingenuous arguments that it has advanced in connection with the instant Motion.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  December 15, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 15, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager